IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| TURTLE ISLAND RESTORATION ) | CV. NO. 09-00598 DAE-KSC |
| NETWORK; CENTER FOR ) | CV. NO. 10-00044 DAE-KSC |
| BIOLOGICAL DIVERSITY; and ) | |
| KAHEA: THE HAWAIIAN ) | |
| ENVIRONMENTAL ALLIANCE, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| UNITED STATES DEPARTMENT ) | |
| OF COMMERCE; NATIONAL ) | |
| MARINE FISHERIES SERVICE; ) | |
| and GARY LOCKE, in his official ) | |
| capacity as Secretary of the ) | |
| Department of Commerce, ) | |
| ) | |
| Defendants, ) | |
| ) | |
| and ) | |
| ) | |
| HAWAII LONGLINE ) | |
| ASSOCIATION, ) | |
| ) | |
| Defendant-Intervenor ) | |
| _____ ) | |
| HAWAII LONGLINE ) | |
| ASSOCIATION, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | |
| NATIONAL MARINE FISHERIES ) | |
| SERVICE; and GARY LOCKE, in ) | |

his official capacity as Secretary of )
the Department of Commerce, )
)
        Defendants. )
_____ )

ORDER: (1) GRANTING PLAINTIFFS' AND FEDERAL DEFENDANTS'
JOINT MOTION TO ENTER STIPULATED INJUNCTION
AS AN ORDER OF THE COURT; (2) DENYING AS MOOT
HLA'S MOTION FOR SUMMARY JUDGMENT

On December 15, 2010, the Court heard Plaintiffs' and Federal

Defendants' Joint Motion to Enter Stipulated Injunction as an Order of the Court.

("Joint Motion," Doc. # 102.)  Paul H. Achitoff, Esq., appeared at the hearing on

behalf of Plaintiffs Turtle Island Restoration Network, Center for Biological

Diversity, and KAHEA: The Hawaiian-Environmental Alliance (collectively,

"Plaintiffs"); Erik E. Petersen, Esq., Frederick W. Tucher, Esq., and Elena Onaga,

Esq. appeared at the hearing on behalf of Defendants United States Department of

Commerce, National Marine Fisheries Service, and Gary Locke in his official

capacity (collectively, "Federal Defendants"); Jeffrey W. Leppo, Esq. and Steven

Y. Otaguro, Esq. appeared at the hearing on behalf of Intervenor-Defendant Hawaii

Longline Association ("HLA").  After reviewing the motion and the supporting,

opposing, and supplemental memoranda, the Court GRANTS Plaintiffs' and

Federal Defendants' Joint Motion to Enter Stipulated Injunction as an Order of the

Court.[1]  (Doc. # 102.)  HLA's Motion for Summary Judgment is DENIED AS

MOOT.  (Doc. # 86.)

BACKGROUND

Plaintiffs Turtle Island Restoration Network, Center for Biological

Diversity, and KAHEA: The Hawaiian-Environmental Alliance (collectively,

"Plaintiffs") are nonprofit environmental organizations and corporations.  On

December 16, 2009, Plaintiffs filed a Complaint against Defendants United States

Department of Commerce, National Marine Fisheries Service ("NMFS"), and Gary

Locke ("Locke") in his official capacity as Secretary of the Department of

Commerce (collectively, "Federal Defendants").  (Doc. # 1.)  On January 5, 2010,

Hawaii Longline Association ("HLA") filed a motion to intervene in the lawsuit

(Doc. # 5), which U.S. Magistrate Judge Kevin S.C. Chang granted on February

12, 2010 (Doc. # 20).  The Court dismissed Plaintiffs' Complaint without prejudice

on June 24, 2010 as a result of certain pleading deficiencies (Doc. # 82), and

Plaintiffs filed a First Amended Complaint ("FAC," Doc. # 84) on the same day.

As recounted in the First Amended Complaint and the parties' various

filings, management of the Hawaii longline fishery (the "Fishery") has been

substantially litigated.  This particular action stems from the December 10, 2009

---

[1]  The consent decree is appended to this Order as Attachment 1.

Final Rule issued by NMFS implementing Amendment 18 to the Fishery Management Plan.  (FAC ¶ 73.)   Among other things, the Final Rule increases the annual number of allowable incidental interactions that occur between the fishery and loggerhead sea turtles.  The lawsuit also challenges the validity of the Biological Opinion that NMFS prepared to assess the Final Rule's impact on threatened and endangered species ("2008 BiOp") and the associated Incidental Take Statement ("ITS").

Plaintiffs advance six causes of action in the First Amended Complaint.  Federal Defendants have allegedly violated the Migratory Bird Treaty Act ("MBTA"), 16 U.S.C. § 703 et seq., Sections 7 and 9 of the Endangered Species Act ("ESA"), 16 U.S.C. § 1531 et seq., the Marine Mammal Protection Act ("MMPA"), 16 U.S.C. § 1361 et seq., the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. § 1801 et seq., and the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 et seq.  (Id. ¶¶ 77–97.)

On April 5, 2010, Plaintiffs' action was consolidated with a case filed on January 22, 2010 by HLA against Locke and NMFS.  (Cv. No. 10-00044, Doc. # 24.)  HLA's suit sought declaratory and injunctive relief based on NMFS's alleged failure to issue determinations and authorizations pursuant to the Marine Mammal Protection Act and the Endangered Species Act.  (Cv. No. 10-00044,

Doc. # 1.)  On December 16, 2010, HLA, NMFS, and Locke stipulated to

voluntary dismissal of HLA's Complaint in the consolidated action.  (Cv. No. 10-

00044, Doc. # 29.)

On September 3, 2010, HLA filed a Motion for Summary Judgment

on Plaintiffs' claims (Docs. ## 86–87) as well as a Concise Statement of Facts in

Support of the Motion (Doc. # 88).  This motion is currently set for hearing.  (Doc.

# 110.)

On October 13, 2010, Plaintiffs and Federal Defendants filed a Joint

Motion to Enter Stipulated Injunction as an Order of the Court ("Joint Motion"),

which in essence is a proposed consent decree that would result in dismissal of all

of Plaintiffs' claims with prejudice.[2]  ("Joint Mot.," Doc. # 102.)  On November

24, 2010, HLA filed an Opposition to the Joint Motion.  ("Opp'n," Doc. # 125.)

Federal Defendants filed a Reply on December 1, 2010.  ("Fed. Defs. Reply," Doc.

# 126.)  Plaintiffs filed a Reply on the same day.  ("Pls. Reply," Doc. # 128.)  At

---

[2]  On the same day, and in response to Plaintiffs' and Federal Defendants' filing of the Joint Motion, HLA filed a Motion for Leave to File First Amended Complaint (Doc. # 103) as well as a Motion to Shorten Time for Hearing on its motion (Doc. # 104).  After Magistrate Judge Chang denied the Motion to Shorten Time (Doc. # 107), HLA withdrew its Motion for Leave to File First Amended Complaint (Doc. # 115).  On October 26, 2010, HLA filed a Complaint in a separate action against NMFS and Locke, alleging that the proposed consent decree contained in the Joint Motion is contrary to law and violative of the APA, the MSA, the ESA, and NEPA.  (Cv. No. 10-00627, Doc. #1.)

the December 15, 2010 hearing on the Joint Motion, the Court, concerned that it did not have sufficient information to analyze the proposed consent decree, directed the parties to file supplemental briefing as to whether the proposed consent decree was fair, reasonable, and equitable and in the public interest. (Doc. # 131.) Federal Defendants submitted their Supplemental Brief on December 30, 2010. ("Fed. Defs. Supp. Br.," Doc. # 133.) Plaintiffs filed their Supplemental Brief on December 31, 2010. ("Pls. Supp. Br.," Doc. # 134.) On January 14, 2011, HLA submitted its Supplemental Brief. ("HLA Supp. Br.," Doc. # 136.)

On November 12, 2010, HLA filed a LR 74.1 Appeal from Magistrate Judge's Non-Dispositive Discovery Order,[3] which arose from HLA's request to take five time-limited depositions of the Federal Defendants. (Doc. # 119.) HLA asserted that these five depositions were necessary for it to acquire information and evidence to oppose the Joint Motion, namely HLA sought to uncover evidence as to whether the proposed consent decree is "fair, reasonable, and equitable and does not violate the law or public policy." (Id. at 1, 4.) Federal Defendants objected to the proposed depositions (id. at 2–3), and on November 4, 2010, HLA and Federal Defendants submitted letter briefs to Magistrate Judge Chang, pursuant to the

---

[3] HLA also filed a Motion to Shorten Time (Doc. # 120), which this Court denied on November 15, 2010 for failure to show good cause (Doc. # 123).

procedure set forth in Local Rule 37.1 (see Doc. # 116).  On November 10, 2010,

Magistrate Judge Chang sustained Federal Defendants' objection and prevented

HLA's taking of the five proposed depositions.  (Doc. # 117.)  On December 17,

2010, this Court affirmed Magistrate Judge Chang's decision, finding that it was

neither clearly erroneous nor contrary to law.  (Doc. # 132.)

## STANDARD OF REVIEW

Approval of a proposed consent decree is within the sound discretion

of the court.  United States v. Oregon, 913 F.2d 576, 580 (9th Cir. 1990); SEC v.

Randolph, 736 F.2d 525, 529 (9th Cir. 1984).  It is well-settled that the court

should enter a consent decree if it determines that "it is fair, reasonable and

equitable and does not violate the law or public policy."  Sierra Club v. Elec.

Controls Design, Inc., 909 F.2d 1350, 1355 (9th Cir. 1990); see also United States

v. Montrose Chem. Corp. of Cal., 50 F.3d 741, 747 (9th Cir. 1995).  If the consent

decree "comes within the general scope of the case made by the pleadings, furthers

the objectives upon which the law is based, and does not violate the statute upon

which the complaint was based, the agreement should be entered by the court."

Hawaii's Thousand Friends, Life of Land, Inc. v. Honolulu, 149 F.R.D. 614, 616

(D. Haw. 1993) (quoting Sierra Club, 909 F.2d at 1355) (internal quotations

omitted).  Additionally, the court must "be satisfied that the decree represents a

'reasonable factual and legal determination.'" <u>Oregon</u>, 913 F.2d at 581 (quoting

<u>United States v. City of Miami</u>, 664 F.2d 435, 441 (5th Cir. 1981) (en banc) (per

curiam) (Rubin, J., concurring)).

Although the court's discretion should be exercised in favor of the

strong policy favoring voluntary settlement of litigation, <u>Ahern v. Cent. Pac.</u>

<u>Freight Lines</u>, 846 F.2d 47, 48 (9th Cir. 1988), when reviewing a consent decree, a

district court must independently scrutinize its terms and avoid "rubber stamp

approval." <u>Montrose Chem. Corp.</u>, 50 F.3d at 747; <u>see also</u> <u>Local No. 93, Int'l</u>

<u>Ass'n of Firefighters v. City of Cleveland</u>, 478 U.S. 501, 525 ("[A] federal court is

more than a recorder of contracts from whom parties can purchase injunctions; it is

an organ of government constituted to make judicial decisions." (citations and

quotations omitted)); <u>Miami</u>, 664 F.2d at 440–41 ("The court . . . must not merely

sign on the line provided by the parties.  Even though the decree is predicated on

consent of the parties, the judge must not give it perfunctory approval."); <u>United</u>

<u>States v. Telluride Co.</u>, 849 F. Supp. 1400, 1402 (D. Colo. 1994) (finding that the

court may not "merely imprimit [the parties'] decision as though possessed of a

clerical rubber stamp").  However, where as here, "a government agency charged

with protecting the public interest 'has pulled the laboring oar in constructing the

proposed settlement,' more deference to the parties' agreement is due because the

district court 'must refrain from second-guessing the Executive Branch."

Montrose Chem. Corp., 50 F.3d at 746 (quoting United States v. Cannons Eng'g
Corp., 899 F.2d 79, 84 (1st Cir. 1990)).

## DISCUSSION

For the reasons set forth below, the Court concludes that the proposed
consent decree is fair, reasonable, and equitable, and does not violate the law or
public policy. The Court therefore grants Plaintiffs' and Federal Defendants' Joint
Motion.

I.    Amendment 18 and the Proposed Consent Decree

On December 10, 2009, NMFS published in the Federal Register a
Final Rule implementing Amendment 18 to the Fishery Management Plan, to be
effective January 11, 2010. See 74 Fed. Reg. 65,460, 65,480 (Dec. 18, 2009)
(codified at 50 C.F.R. pt. 300 & 665). NMFS published the proposed rule on June
19, 2009, and the public comment period ended on August 3, 2009. Id. at 65,461.
NMFS received public comments and provided published responses. Id. The rule
"removes the annual limit on the number of fishing gear deployments (sets) for the
Hawaii-based pelagic shallow-set longline fishery, and increases the annual
number of allowable incidental interactions that occur between the fishery and
loggerhead sea turtles." Id. at 65,460. Under the Final Rule, the longline fleet is

prohibited from interacting with "more than 46 loggerhead sea turtles or 16 leatherback sea turtles each year." Id. The rule also "removes the annual limits on shallow-set fishing effort and the requirements of the shallow-set certificate program found at 50 CFR 665.33, the related prohibitions at 50 CFR 665.22, and the definition of a shallow-set certificate found at 50 CFR 665.12." Id. at 65,461. Thus, among other things, the Final Rule increased the incidental take limit for loggerhead sea turtles from 17 per year to 46 per year and eliminated the restriction that limited swordfish longlining to 2,120 sets per year.

Plaintiffs and Federal Defendants submitted the proposed consent decree to the Court on October 13, 2010 as part of the Joint Motion. The substantive provisions of the proposed consent decree provide as follows: (1) those portions of the 2008 BiOp and ITS that relate to loggerhead and leatherback sea turtles are vacated and remanded to Federal Defendants (Stip. Inj. ¶ 1); (2) those portions of the Final Rule that relate to the incidental take of loggerhead and leatherback sea turtles are vacated and remanded to Federal Defendants (id. ¶ 2); (3) the incidental take limits for loggerhead and leatherback sea turtles that were in place before the Final Rule was issued are reinstated[4] (id. ¶ 3); (4) after the Court

_____

[4] Specifically, the incidental take limits for loggerhead and leatherback sea turtles established under the regulations published at 69 Fed. Reg. 17329 (Apr. 2, 2004) and the associated biological opinion and incidental take statement that

10

enters the Stipulated Injunction, NMFS must promulgate a rule to formalize the change in incidental take limits for loggerhead and leatherback sea turtles (id. ¶ 4); (5) NMFS cannot increase the incidental take limits for leatherback or loggerhead sea turtles by the Fishery unless NMFS prepares a new biological opinion and issues a new regulation (id. ¶ 5); (6) NMFS must issue a new biological opinion for the Fishery no later than 135 days after NMFS makes a final determination on its proposed listing of nine distinct population segments of listed loggerhead sea turtles (id. ¶ 6); (7) all of Plaintiffs' claims are dismissed with prejudice (id. ¶ 17).

Thus, under the terms of the proposed consent decree, the Final Rule will remain in place, but the incidental take limits for loggerhead and leatherback sea turtles will revert back to the levels existing prior to the Final Rule.[5]  The proposed consent decree also requires that NMFS complete a new biological opinion within 135 days after it makes a final determination of its pending proposed listing of nine distinct population segments of listed loggerhead sea

---

relate to loggerhead and leatherback sea turtles are reinstated.  (Stip. Inj. ¶ 3.)

[5]  Although paragraphs 1 through 3 of the proposed consent decree apply to both loggerhead and leatherback sea turtles (Stip. Inj. ¶¶ 1–3), in actuality, they only affect loggerhead sea turtles because the Final Rule did not change incidental take limits for leatherback sea turtles (see 74 Fed. Reg. 65,460 (Dec. 18, 2009); 69 Fed. Reg. 17329 (Apr. 2, 2004)).  Therefore, the proposed consent decree reduces the incidental take limit for loggerhead sea turtles from 46 to 17, but the incidental take limit for leatherback sea turtles remains at 16.

turtles.[6]  NMFS indicates that it plans to complete its loggerhead turtle distinct

population segment listing determination by March 16, 2011, which would make

the new Fishery biological opinion due approximately on July 31, 2011.  (Id.)

II.    Applicability of Environmental Statutes

HLA argues primarily that the proposed consent decree is contrary to

law because it allows Federal Defendants to circumvent the reach of the

Administrative Procedure Act ("APA"), the Magnuson-Stevens Fishery

Conservation and Management Act ("MSA"), the Endangered Species Act

("ESA"), and the National Environmental Policy Act ("NEPA") as well as their

corresponding regulatory schemes.  HLA's assertion hinges on the applicability of

these statutes to consent decrees and Federal Defendants' ability to enter into

consent decrees.  Because a consent decree is a "judicial act" rather than an agency

act, Federal Defendants are not required to ensure that their stipulation to the

proposed consent decree complies with these statutes.

---

[6]  This deadline is meant to prevent NMFS from having to redo its biological
opinion twice in the span of two years.  (Joint Mot. at 3.)  Apparently, the
loggerhead sea turtle is currently listed as one species, but NMFS has issued a
proposed listing rule to change the listing status of loggerhead sea turtles into nine
distinct population segments.  (Id.)  Plaintiffs and Federal Defendants represent
that because this change could affect any biological opinion analysis related to the
Fishery, it would be "prudent" to await the final loggerhead distinct population
segment listing determination prior to embarking on the new Fishery biological
opinion analysis.  (Id.)

As a preliminary matter, "[A] consent decree has attributes of both a contract and a judicial act." <u>Olney v. United States</u>, 543 F.3d 1168, 1173–74 (9th Cir. 2008). "Consent decrees entered in federal court must be directed to protecting federal interests." <u>Frew v. Hawkins</u>, 540 U.S. 431, 437 (2004). The Supreme Court has characterized a consent decree as "an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees." <u>Rufo v. Inmates of Suffolk Cnty. Jail</u>, 502 U.S. 367, 378 (1992); <u>Frew</u>, 540 U.S. at 437 (same). Further, "[a] consent decree is a judgment, has the force of res judicata, and it may be enforced by judicial sanctions, including . . . citations for contempt." <u>Randolph</u>, 736 F.2d at 528. A court may also "modify a consent decree in certain circumstances over the objection of a signatory." <u>Local No. 93</u>, 478 U.S. at 518 (citation omitted). Accordingly, although a contract between parties, a consent decree's enforcement is entirely dependent upon judicial act. As discussed <u>infra</u>, the statutes and regulations relied upon by HLA do not contemplate their applicability to consent decrees.[7]

---

[7] In their supplemental brief, HLA questions whether the proposed consent decree is actually a consent decree. (HLA Supp. Br. at 3–4.) The Court finds that it is. As HLA points out, a consent decree is a settlement by parties that is "subject to continued judicial policing." <u>See</u> <u>Oregon</u>, 913 F.2d at 580. Despite HLA's arguments to the contrary, the Court is required to police and oversee the proposed

Perhaps best illustrative of this principle is <u>Home Builder</u>

<u>Associations of Northern California v. Norton</u>, 293 F. Supp. 2d 1 (D.D.C. 2002).

There, the plaintiffs sought review under the APA and the ESA of the Secretary of

the Interior's decision to designate 4.1 million acres as a critical habitat for an

endangered frog.  <u>Id.</u> at 2.  Similar to the instant case, before the <u>Home Builder</u>

court was a consent decree proposing both to vacate all habitat designations and to

remand to the agency "for a new rulemaking."  <u>Id.</u>  An intervenor-defendant that

was not a party to the settlement, as here, disagreed with the terms of the consent

decree and argued they violated the APA and the ESA.  <u>Id.</u> at 2–3.  The <u>Home</u>

<u>Builder</u> court reviewed the consent decree and found that it was "fair, adequate and

reasonable under the facts, and should be entered."  <u>Id.</u> at 3.  It went on to dispose

of the intervenor-defendant's argument that the consent decree violated the notice

and comment requirements of 5 U.S.C. § 553, the APA, by noting that the a

consent decree is a "judicial act" and that  "adoption of a consent decree is not an

---

consent decree here.  For instance, a major concern of HLA's is that Federal
Defendants will be able to circumvent statutory deadlines by perpetually delaying a
decision as to the loggerhead sea turtle status.  Because this is a consent decree, the
Court in this scenario would be able to modify the terms of the consent decree over
Federal Defendants' objection if the circumstances warranted.  <u>Local No. 93</u>, 478
U.S. at 518.

agency act under the APA." Home Builder, 293 F. Supp. 2d at 5 (quotations and citations omitted).

HLA relies heavily on United States v. Carpenter, 526 F.3d 1237 (9th Cir. 2008), to argue that entering into a consent decree is agency action, which would trigger these statutes. The Court is not persuaded. At issue in Carpenter was a road in Elko County, Nevada. Id. at 1238. In 1999, the United States Forest Service sued residents of Elko County, Nevada who were restoring the road. Id. at 1238–39. The road was adjacent to a river populated by Bull Trout, a threatened species, and the United States was concerned about the restoration's potential effect on the trout population. Id. at 1239. Soon after, Elko County was added as a defendant, and it counterclaimed against the United States on the basis that title to an easement for the roadway should be quieted. Id. Ultimately the parties settled in front of a magistrate judge. Id. The terms of the agreement provided as follows:

> The United States agreed that it would not contest that Elko County had a right of way to the road, but did not waive its authority to manage federal lands and natural resources in accordance with federal environmental laws. [Elko County] agreed that they would not do any work on the road without receiving prior approval from the Forest Service and that they would comply with federal environmental laws.

Id. After an appeal, the intervenor environmentalists filed cross-claims against the United States pursuant to the APA and challenged the terms of the settlement

agreement as violative of NEPA.  <u>Id.</u>  The district court judge dismissed the cross-

claims believing that the Attorney General's decision to settle litigation was not

reviewable under the APA.  <u>Id.</u>  On appeal the intervenors alleged that the United

States granted Elko County a property interest in public land without complying

with the procedural mechanisms for relinquishing title.  <u>Id.</u> at 1242.  The Ninth

Circuit agreed and held that the cross-claims were reviewable under the APA.  <u>Id.</u>

Specifically, the Ninth Circuit noted:

> [P]lenary power means absolute authority to pursue legitimate
> objectives and does not include license to agree to settlement terms
> that would violate the civil laws governing the agency.  We find the
> Fourth Circuit's reasoning persuasive in this case.  We agree with its
> statement that, we think it alien to our concept of law to allow the
> chief legal officer of the country to violate its laws under the cover of
> settling litigation.  The Attorney General's authority to settle litigation
> for its government clients stops at the walls of illegality.

<u>Id.</u> (citations and quotations omitted).

The instant case is easily distinguishable from <u>Carpenter</u>.  As a

preliminary matter, the Court has before it a proposed consent decree, which was

not before the court in <u>Carpenter</u>.  Further, Federal Defendants are in no way

relinquishing rights in land or otherwise to Plaintiffs.  Indeed, the procedural

posture here is completely different than in <u>Carpenter</u>.  Here, Plaintiffs challenged

Federal Defendants' new regulations for failing to comply with the MBTA, the

ESA, the MMPA, the MSA, and the APA. (FAC at 2–3.) After months of negotiations, Plaintiffs and Federal Defendants agreed to terms via a <u>temporary</u> agreement implemented by consent decree whereby Plaintiffs are granted relief for alleged ESA and MSA violations contained in Counts II and III of the First Amended Complaint. (Pls. Supp. Br. at 2.) Specifically, the loggerhead sea turtle incidental take limit returns temporarily to its 2004 level, until NMFS completes a new biological opinion and incidental take statement in compliance with the appropriate rules and regulations. (Stip. Inj. ¶¶ 4, 6, 12.) In the interim, a temporary amalgam of the 2009 Regulations and the 2004 Regulations governs. In <u>Carpenter</u>, by contrast, the United States simply agreed that Elko County had a right-of-way near a listed species' habitat without considering the potential consequences. There were no prior regulations at issue, nor was the agreement temporary. Indeed, the instant case is quite far removed from <u>Carpenter</u>.

Instead, the proposed consent decree partially vacates the current biological opinion and incidental take statement. (Stip. Inj. ¶ 4.) This relief is consistent with the general rule that pre-existing regulations become effective after a vacatur.[8] <u>See Paulson v. Daniels</u>, 41 F.3d 999, 1008 (9th Cir. 2005) ("The effect

---

[8] It is worthy of note that in the environmental context, courts consider the well-being of the species in determining whether to vacate an erroneously promulgated rule or regulation. Indeed, where the defectively issued rule is more

of invalidating an agency rule is to reinstate the rule previously in force.");

CropLife Am. v. EPA, 329 F.3d 876, 884–85 (D.C. Cir. 2003) (finding after

vacatur that "[t]he consequence is that the agency's previous practice . . . is

reinstated and remains in effect unless and until it is replaced by a lawfully

promulgated regulation"); see also Citizens for Better Forestry v. U.S. Dep't of

Agric., 632 F. Supp. 2d 968, 982 (N.D. Cal. 2009) (finding that a regulation that

did not satisfy the ESA's requirements was invalidated and that "[t]he effect of

invalidating an agency rule  is to reinstate the rule previously in force" (internal

quotations omitted)).

 By its argument, HLA would have the Court craft a rule whereby a

federal agency could not settle a claim against it via consent decree without first

revisiting the same procedures that gave rise to the regulation at issue in the

litigation.  This would not only strip the parties of the ability to settle, contrary to

strong public policy, see Leppind v. Mukasey, 530 F.3d 862, 863 (9th Cir. 2008), it

would also divest this Court of its meaningful oversight function in the consent

---

protective of the species, a court, in its equitable discretion, may keep the defective
regulation in effect during a remand.  See, e.g., Natural Res. Def. Council, 275 F.
Supp. 2d 1136, 1145–46 (C.D. Cal. 2002).  Consistent with this principle, the
Court finds that the vacatur in the proposed consent decree is more protective of
loggerhead sea turtles because it reduces the total number of permissible
interactions from forty-six per year to seventeen.

decree process. Indeed, this rule would render consent decrees a virtual nullity, which cannot be correct, particularly in light of the strong public policy favoring settlement.

The plain language of the statutes themselves also demonstrates that they are inapplicable to consent decrees.

A.    <u>Administrative Procedure Act ("APA")</u>

The APA provides, <u>inter alia</u>, that federal agencies must follow certain procedures, such as providing for public notice and comment before "rulemaking." 5. U.S.C. § 553(b). For the purposes of the statute, amending or repealing a rule requires recommencing the rulemaking process. <u>Id.</u> HLA argues that "the proposed stipulated injunction would accomplish exactly what Congress determined a federal agency cannot do: promulgate, amend, and repeal a rulemaking without public notice and comment." (Opp'n at 13.) The Court disagrees.

As noted, a consent decree is a judicial act, rather than an agency act. <u>See</u> <u>Norton</u>, 293 F. Supp. 2d at 5 ("As such, the Court does not find that the notice and comment requirements of 5 U.S.C. § 553 apply before the Court's adoption of a consent decree, as adoption of a consent decree is not an agency act under the APA."); <u>Citizens for a Better Env't v. Gorsuch</u>, 718 F.2d 1117, 1136 (D.C. Cir.

1983) (Wilkey, J., dissenting) ("This court has previously ruled that the consent decree at issue here does not rise to the level of a rulemaking."); Id. ("The commitment that occurs through a consent decree takes place, however, without recourse to the public notice requirements of notice and comment rulemaking."). Accordingly, the APA is not applicable to the proposed consent decree.

Further, the case law upon which HLA relies to bolster this proposition, Consumer Energy Council v. Fed. Energy Regulatory Comm'n, 673 F.2d 425 (D.C. Cir. 1982), contemplated that "notice and an opportunity to comment [must] be provided prior to agency decisions to repeal a rule." Id. at 446 (emphasis added). As noted, this is not agency action, but judicial act. To the extent HLA argues otherwise, it is simply incorrect. Paragraph 4 of the proposed consent decree states:

> Following the entry of this Stipulated Injunction, as an order of the Court NMFS shall initiate appropriate rulemaking to implement the amount of annual incidental take for loggerhead and leatherback sea turtles as set forth in the 2004 Regulations identified in Paragraph 3.

(Stip. Inj. ¶ 4 (emphasis added).) Thus, the language of the proposed consent decree itself suggests this is not agency action but instead judicial act.[9] Nothing in

---

[9] By contrast, Federal Defendants must thereafter "issue a new biological opinion and new incidental take statement." (Stip. Inj. ¶ 6.) This will, without question, be an agency act subject to the APA. See Ramsey v. Kantor, 96 F.3d 434, 443 n.16 ("[A]ctions subsequently taken through or under the plan cannot be

the APA contemplates its applicability to a judicial act, and therefore the APA is

inapplicable to the Court's present inquiry.

> B.    Magnuson-Stevens Fishery Conservation and Management Act
>        ("MSA")

HLA alleges that the proposed consent decree runs afoul of the MSA

in three ways: procedurally, substantively, and by violating the judicial review

provisions of the MSA.  (Opp'n at 15–21.)  The Court is not persuaded.  The MSA

is a comprehensive national program designed to promote and manage domestic

commercial fisheries.  See 16 U.S.C. § 1801(b) (describing the purposes of the act

to be, inter alia, "to take immediate action to conserve and manage the fishery

resources found off the coasts of the United States, and the anadromous species

and Continental Shelf fishery resources of the United States" and "to promote

domestic commercial and recreational fishing under sound conservation and

management principles").  Congress accomplished these goals, in part, through the

development of regional fishery management councils, which propose fishery

management plans ("FMPs") to regulate fisheries within their region.  Id. § 1852.

---

considered actions by the Judiciary." (emphasis added)).  Indeed, the proposed
consent decree acknowledges this by noting that "[n]o provision of this Stipulated
Injunction shall be interpreted as or constitute a commitment or requirement that
the Federal Defendants take action in contravention of any law or regulation, either
substantive or procedural."  (Stip. Inj. ¶ 12.)

The Western and Central Pacific fisheries are managed by the Western Pacific Council.  Id. § 1852(a)(1)(H).  The MSA and its regulations also establish the procedural and substantive requirements applicable to MSA regulations implementing FMP amendments as well as the content of the FMP amendments themselves.  Id. §§ 1851–1856.

      The MSA is simply inapplicable to the instant action.  Not only is this proposed consent decree a judicial act, but the plain language of the MSA makes clear that its governing provisions are applicable to an FMP prepared by a fishery management council, such as the Western Pacific Council, or the Secretary of the Department of Commerce.  See, e.g., 16 U.S.C. § 1852(h) ("Each Council shall, in accordance with the provisions of this chapter . . . ." (emphasis added)); 16 U.S.C. § 1853(a) ("Any fishery management plan which is prepared by any Council, or by the Secretary with respect to any fishery, shall . . . ." (emphasis added)); 16 U.S.C. § 1853(b) (same); 16 U.S.C. § 1854(a) ("Upon transmittal by the Council to the Secretary of a fishery management plan or plan amendment, the Secretary shall . . . ." (emphasis added)).  This is  not the scenario here.  Neither the Western Pacific Council nor the Commerce Secretary is preparing an FMP.  Instead, the Federal Defendants are stipulating to enter into a proposed consent decree.  There

is simply no indication that the MSA was intended to govern the terms of a consent decree.[10]

    C.    <u>Endangered Species Act ("ESA")</u>

The purpose of the ESA is "to provide a means whereby the ecosystems upon which endangered species and threatened species depend may be conserved [and] to provide a program for the conservation of such endangered species and threatened species." 16 U.S.C. § 1536. To this end, the ESA regulatory regime has established an interagency consultation process to ensure that federal actions do not jeopardize listed species. <u>See</u> 50 C.F.R § 402.14. Specifically, a federal agency that wishes to carry out an action that "may affect" a listed species or critical habitat must formally consult with either the United States Fish and Wildlife Service or NMFS.[11] <u>See</u> 16 U.S.C. § 1536(a)(2); 50 C.F.R. §§ 402.13, 402.14. During consultation, NMFS must review all relevant information to formulate "its biological opinion as to whether the action, taken

---

[10] Indeed, HLA cites to no regulation, statute, caselaw, or other authority to suggest otherwise.

[11] Here, NMFS is both the acting and consulting agency. In such a scenario NMFS would have to consult with itself. <u>See</u> 16 U.S.C. § 1536(a)(2); <u>see also</u> <u>Greenpeace Foundation v. Mineta</u>, 122 F. Supp. 2d 1123, 1127 n.5 (D. Haw. 2000) (noting that where "NMFS is both the acting and consulting agency . . . NMFS consults with itself).

together with cumulative effects, is likely to jeopardize the continued existence of listed species or result in the destruction or adverse modification of critical habitat."  50 C.F.R. § 402.14(g)(1)–(4).  This opinion must provide a summary of the information on which the opinion is based, a discussion of the effects of the action listed on species or critical habitat, and an opinion on whether the action is likely to jeopardize the continued existence of a listed species.  Id. § 402.14(h).  If the NMFS concludes that an action is not likely to jeopardize the continued existence of a listed species, it must also issue an incidental take statement based on its biological opinion, which specifies the amount or extent of incidental take. Id. § 402.14(i).  The ESA also requires that the consulting agency base its biological opinion on "the best scientific and commercial data available."  16 U.S.C. § 1536(a)(2).

HLA argues that Federal Defendants have not complied with the ESA requirements before entering into the proposed consent decree.  Specifically, HLA argues that the ESA has been violated in the following five ways: (1) the ESA does not grant NMFS authority or discretion to vacate all or portions of a biological opinion or incidental take statement; (2) the 2004 biological opinion does not analyze the effects of Amendment 18; (3) the 2004 incidental take statement does not authorize the expected incidental take from Amendment 18 and is not based

upon the best available scientific and commercial data; (4) the proposed consent decree violates statutory deadlines for the consultation process; and (5) there was no consultation. (Opp'n at 25–32.) The Court does not agree.

As with the APA and the MSA, the ESA does not contemplate its applicability to judicial act. Instead, by its plain language, it requires federal agencies taking action that could potentially threaten a listed species' habitat to comply with its terms. <u>See, e.g.</u>, 16 U.S.C. § 1536(a)(2) ("<u>Each Federal agency shall</u>, in consultation with and with the assistance of the Secretary, insure that any action authorized, funded, or carried out by such agency . . . is not likely to jeopardize the continued existence of any endangered species or threatened species or result in the destruction or adverse modification of habitat of such species which is determined by the Secretary." (emphasis added)); 50 C.F.R. §§ 402.13 ("Informal consultation is an optional process that includes all discussions, correspondence, etc., <u>between the Service and the Federal agency</u> or the designated non-Federal representative, <u>designed to assist the Federal agency</u> in determining whether formal consultation or a conference is required."). Accordingly, in the absence of authority to the contrary, the Court sees no reason to apply the ESA's requirements to a consent decree.

D. National Environmental Policy Act ("NEPA")

NEPA requires, <u>inter alia</u>, that federal agencies that implement regulations to prepare an environmental impact statement ("EIS") for all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4. As with the ESA, the MSA, and the APA, the Court is not persuaded that the Federal Defendants have implemented a regulation such that it must prepare an EIS. Instead it has agreed to a proposed consent decree and, pursuant to judicial act, one portion of Amendment 18 is vacated. NEPA does not contemplate its applicability to judicial act and is therefore not applicable here.

For these reasons, the Court cannot find that the proposed consent decree is contrary to the APA, the MSA, the ESA, or NEPA.

III.    <u>Fair, Reasonable, and Equitable</u>

A.    <u>Fairness</u>

"'Fairness should be evaluated from the standpoint of signatories and nonparties to the decree.'" <u>United States v. Akzo Coatings of Am., Inc.</u>, 949 F.2d 1409, 1435 (6th Cir. 1991) (quoting <u>United States v. Conservation Chem. Co.</u>, 628 F. Supp. 391, 401 (W.D. Mo. 1985)). In determining whether a proposed consent decree is fair, courts examine both procedural and substantive fairness. <u>See</u> <u>United States v. Cannons Eng'g Corp.</u>, 899 F.2d 79, 86 (1st Cir. 1990); <u>United States v.</u>

Chevron U.S.A. Inc., 380 F. Supp. 2d 1104, 1111 (N.D. Cal. 2005); Telluride Co., 849 F. Supp. at 1402; United States v. BP Exploration & Oil Co., 167 F. Supp. 2d 1045, 1051–52 (N.D. Ind. 2001).

     1.    Procedural Fairness

First, courts examine procedural fairness to determine whether the negotiation process was "'fair and full of adversarial vigor.'"  Chevron, 380 F. Supp. 2d at 1111 (quoting Telluride, 849 F. Supp. at 1402).  If the decree is the product of "'good faith, arms-length negotiations,'" it is "'presumptively valid.'"  Chevron, 380 F. Supp. 2d at 1111 (quoting Oregon, 913 F.2d at 581); see also Cannons Eng'g Corp., 899 F.2d at 87 n.4.

It is readily apparent that the proposed consent decree is procedurally fair.  Although the terms of the proposed consent decree are relatively straightforward, the parties nevertheless engaged in more than three months of negotiations.  (See Pls. Supp. Br., Achitoff Decl. ¶ 3.)  Apparently, during the course of negotiations, Plaintiffs' and Federal Defendants' ability to ultimately settle the case "was often in doubt."  (Id.)  Even after Plaintiffs and Federal Defendants agreed to the terms of the proposed consent decree, the federal government conducted its own review of the proposed consent decree prior to its submission to this Court.  In this Court's experience, Plaintiffs' and Federal

Defendants' interests have seldom been aligned, and Federal Defendants even opposed Plaintiffs' Motion for Partial Summary Judgment in the instant lawsuit (see Docs. ## 76, 77).  Based on Plaintiffs' and Federal Defendants' dealings, as well as the information currently before the Court, there is nothing to suggest that the proposed consent decree resulted from anything other than "good faith, arms-length negotiations."  See Oregon, 913 F.2d at 581.  Accordingly, the Court concludes that the proposed consent decree is procedurally fair.

2.    Substantive Fairness

Second, courts examine the substantive fairness of the proposal.  In evaluating the substantive fairness, it is "important for the district court to be fully informed regarding the costs and benefits of the decree."  Chevron U.S.A. Inc., 380 F. Supp. 2d at 1113 (citing Montrose Chem. Corp., 50 F.3d at 746).  "[I]t is not the duty of the court to determine whether 'the settlement is one which the court itself might have fashioned, or considers ideal.'"  Chevron U.S.A. Inc., 380 F. Supp. 2d at 1111 (quoting Cannons, 899 F.2d at 84) (internal quotations omitted); see also BP Exploration, 167 F. Supp. 2d at 1050 (stating that a court should refrain from "substitut[ing] its judgment for that of the parties").  Rather, substantive fairness "mirrors the requirement that the [consent] decree be equitable."  Telluride, 849 F. Supp. at 1402.  "[T]he court's approval is nothing more than an amalgam of

delicate balancing, gross approximations and rough justice." <u>Oregon</u>, 913 F.2d at

581 (internal quotations omitted).

The proposed consent decree embodies a carefully negotiated

compromise, the terms of which reflect the relief prioritized by the parties.

Plaintiffs sought to have Amendment 18 invalidated in its entirety, and Federal

Defendants argued that Amendment 18 was promulgated in compliance with the

relevant statutes and regulations. Reflecting Plaintiffs' and Federal Defendants'

compromise, the proposed consent decree vacates and remands only a portion of

Amendment 18, and the rest remains in full force and effect. Specifically,

Plaintiffs and Federal Defendants agreed as follows: in exchange for Federal

Defendants' agreement to reduce the incidental take limit of loggerhead sea turtles

from 46 to 17 per year, back to the 2004 levels, Plaintiffs will forego their

challenge to both the Final Rule's authorization to take migratory birds and its

removal of the annual limit on the shallow-set fishing effort. In reaching this

agreement, neither Plaintiffs nor Federal Defendants received the measure of relief

they would have obtained had they prevailed on the merits.

Furthermore, by setting a defined period of time within which the new

biological opinion must be promulgated, HLA is not unduly harmed by the

proposed consent decree. Based upon NMFS's estimated time frame for

completion of the new biological opinion (see Joint Mot. at 3), the Fishery will likely be operating at the lower incidental take limits for a period of six months. From 2004 until Amendment 18 was promulgated in 2010, the regulations permitted an incidental take of 17 loggerhead sea turtles per year. During this time, the Fishery reached the incidental take limit only once, in 2006. See National Marine Fisheries Service Pacific Island Regional Office, Sea Turtle Interactions, http://www.fpir.noaa.gov/SFD/SFD_turtleint.html. HLA argues that its historical interactions are not probative because from 2004 until 2010, when the Final Rule became effective, there was a 2,190 set limit on the shallow-set fishery. Amendment 18 removed that limitation from the shallow-set fishing effort. To the contrary, the Court finds that the historical interactions are probative. The Final Rule became effective on January 11, 2010, and the Fishery operated under its terms for that year. Despite having an unlimited number of sets, the Fishery still only had a total of 7 interactions with loggerhead sea turtles for the entire year.[12]

---

[12] Four loggerhead sea turtle interactions have occurred in the Fishery to date in 2011. See National Marine Fisheries Service Pacific Island Regional Office, Sea Turtle Interactions, http://www.fpir.noaa.gov/SFD/SFD_turtleint.html. However, the Court will not speculate as to how many total interactions the Fishery will have with loggerhead sea turtles in 2011. Based on the historical interactions with loggerhead sea turtles, the proposed consent decree will not unduly harm the Fishery, especially because the reduced incidental take limit will be in effect for only a limited period of time.

Unless the incidental interactions more than double from 2010 to 2011, and the Fishery somehow reaches the reduced incidental take limit for loggerhead sea turtles before NMFS issues the new biological opinion, the Fishery should not be unduly harmed by the proposed consent decree. Even if NMFS does not complete the new biological opinion by its estimated deadline, the proposed consent decree still does not unreasonably extend the period of time during which the Fishery must operate under the 2004 levels.

Finally, if the Fishery does reach the reduced incidental take limits for loggerhead sea turtles before NMFS issues the new biological opinion and the Fishery must be shut down, this result would be consistent with the goals of the ESA and in the public's interest. See Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978) ("The plain intent of Congress in enacting [the ESA] was to halt and reverse the trend toward species extinction, whatever the cost."). At a time when NMFS is investigating whether to uplist the loggerhead sea turtle from threatened to endangered, it is a prudent measure to reduce the incidental take limits while NMFS is making this determination.

B.    Reasonableness

A careful and searching review of the proposed consent decree reveals that it is reasonable. The primary effect of the proposed consent decree is to

reduce the incidental take limit of loggerhead sea turtles to the 2004 level.

Loggerhead sea turtles have been listed as threatened for many years, and as discussed, the NMFS has recently proposed to list them as endangered. 75 Fed. Reg. 12598 (Mar. 16, 2010). By reducing the Fishery's incidental take limit for loggerhead sea turtles from 46 to 17, the proposed consent decree reduces the risk of harm to loggerhead sea turtles while NMFS prepares a new biological opinion assessing the proposed change in status of the loggerhead sea turtle as endangered. The risk of harm without the proposed consent decree is particularly acute because Amendment 18 removed the annual limit on the shallow-set fishing effort.

Furthermore, the alternative to the proposed consent decree is litigation of the merits of the case. HLA downplays the significance of such litigation here because the instant lawsuit challenges the actions of an administrative agency such that the record review rule applies, and the merits of the case could be resolved by motions for summary judgment. (HLA Supp. Br. at 31 n.25.) This argument overlooks the fact that voluntary settlement of litigation is the preferable course of action. See Ahern, 846 F.2d at 48.

HLA argues that the proposed consent decree is unreasonable because it is scientifically unsound. (Opp'n at 35–36.) Provided that the proposed consent decree is fair, reasonable, and equitable, and does not violate the law or public

policy, it need not utilize the best scientific evidence. Such a requirement would transform evaluation of a proposed consent decree into a decision on the merits in contravention of controlling authority. See Oregon, 913 F.2d at 582.

IV.     Other Considerations

A.     Public Interest

Here, because the parties seek to incorporate their settlement into a court order, and because public interests are at stake, the Court must make an independent and searching inquiry, carefully scrutinizing the proposed consent decree. Oregon, 913 F.2d at 581 (recognizing that when a consent decree affects the public interest, the Ninth Circuit has imposed a duty on the court to protect those interests); Miami, 644 F.2d at 441 ("If the decree also affects third parties, the court must be satisfied that the effect on them is neither unreasonable nor proscribed."); Telluride Co., 849 F. Supp. at 1402. However, "the court need not require that the decree be 'in the public's best interest' if it is otherwise reasonable." Oregon, 913 F.2d at 581 (quoting Randolph, 736 F.2d at 529).

Whether a consent decree is within the public interest in part depends on whether it is "consistent with the statute that the judgment was meant to enforce." Citizens for a Better Env't v. Gorsuch, 718 F.2d 1117, 1128 (D.C. Cir.

1983).  The two statutes most implicated by the proposed consent decree are the ESA and the MSA.

The purpose of the ESA is to conserve endangered and threatened species and their ecosystems.[13]  16 U.S.C. § 1531(b); see also Tenn. Valley Auth., 437 U.S. at 174 ("[E]xamination of the language, history, and structure of the [ESA] indicates beyond doubt that Congress intended endangered species to be afforded the highest of priorities.").  In furtherance of these policies, the proposed consent decree temporarily reduces the yearly incidental take limits for loggerhead sea turtles from forty-seven to seventeen while the NMFS determines whether to uplist the turtles from threatened to endangered.

As noted, the purpose of the MSA is "to take immediate action to conserve and manage the fishery resources found off the coasts of the United States, and the anadromous species and Continental Shelf fishery resources of the United States" and "to promote domestic commercial and recreational fishing under sound conservation and management principles."  See 16 U.S.C. § 1801(b).  The proposed consent decree furthers these objectives because it does not reinstate

---

[13]  The ESA defines conserve as "us[ing] . . . all methods and procedures . . . necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."  16 U.S.C. § 1532(3).

the 2,190 set limit, thus promoting fishing efforts, yet it decreases the incidental

interactions permitted with loggerhead sea turtles in an effort to conserve the

species.

In any event, the Ninth Circuit is here clear. "[P]reserving

environmental resources is certainly in the public's interest." The Lands Council

v. McNair, 537 F.3d 981, 1005 (9th Cir. 2008) (en banc) overruled in part on other

grounds as recognized by Am. Trucking Ass'ns, Inc. v. City of L.A., 559 F.3d

1046, 1052 (9th Cir. 2009). Accordingly, the Court finds that the proposed consent

decree is in the public interest.

B.     Agency Discretion

When a government agency is the target of a consent decree, the Court

must ensure that the proposed consent decree does not unduly constrain the

agency's discretion. See Gorsuch, 718 F.2d at 1129. Here, the terms of the

proposed consent decree will remain in place, and NMFS will be precluded from

increasing the incidental take limits for leatherback or loggerhead sea turtles, only

until NMFS prepares a new biological opinion and issues a new regulation. (See

Stip. Inj. ¶ 5.) Pursuant to the proposed consent decree, NMFS must prepare this

new biological opinion within 135 days of finalization of its loggerhead sea turtle

distinct population segment ("DPS") determination. (Id. ¶ 6.) Although the

proposed consent decree does not set forth a specific date for completion of the biological opinion, the time period during which NMFS must operate under the proposed consent decree is nonetheless limited. NMFS anticipates that it will finalize its loggerhead DPS determination by March 16, 2011 (Joint Mot. at 3), which would make the new biological opinion due by approximately July 31, 2011. Furthermore, because the loggerhead DPS determination may affect the new biological opinion, there is a legitimate reason for pegging the deadline for completion to finalization of the loggerhead DPS determination.

Additionally, nothing in the proposed consent decree dictates the outcome of the new biological opinion. NMFS is free to even increase the incidental take limits for loggerhead sea turtles provided that it complies with the law in promulgation of the new biological opinion. Given the limited duration of the proposed consent decree, and that it does not prescribe a particular outcome for the new biological opinion, the Court cannot conclude that the proposed consent decree unduly constrains agency discretion.

V.      HLA's Additional Arguments

HLA raises several additional arguments, not previously addressed. First, HLA emphasizes that it was not involved in the settlement negotiations, and argues that it is thus disadvantaged in opposing the proposed consent decree.

(Opp'n at 34.)  Even if HLA was in fact excluded from the settlement process,[14] the

Government need not allow third parties to participate in settlement negotiations.

BP Exploration, 167 F. Supp. 2d at 1052; see also Cannons Eng'g, 899 F.2d at 93

(holding that in the CERCLA context "the government is under no obligation to

telegraph its settlement offers, divulge its negotiating strategy in advance, or

surrender the normal prerogatives of strategic flexibility which any negotiator

cherishes").  Furthermore, because Plaintiffs and Federal Defendants did not

originally provide sufficient information as to whether the proposed consent decree

was fair, reasonable, and equitable, the Court ordered supplemental briefing on

precisely that issue.  (Doc. # 131.)  Plaintiffs' and Federal Defendants'

supplemental briefs explain in detail why they believe that the proposed consent

decree meets this standard.  HLA was also provided the opportunity to respond to

these supplemental briefs and rebut Plaintiffs' and Federal Defendants' respective

arguments, which remedies HLA's complaint that it did not have adequate

information to oppose the Joint Motion.[15]  As noted, it was not necessary for HLA

---

[14] There is some dispute as to whether HLA was in fact excluded from
participating in the negotiations that ultimately produced the proposed consent
decree.  (Pls. Supp. Br. at 6; Fed. Defs. Supp. Br. at 3.)

[15]  To the extent that HLA argues it was entitled to discovery, the Court finds
that directing Plaintiffs and Federal Defendants to submit supplemental briefing as
to whether the proposed consent decree was fair, reasonable, and equitable more

to be a part of the settlement negotiations, which ultimate led to the proposed consent decree.

Additionally, HLA provides additional arguments detailing the shortcomings it associates with the proposed consent decree's amalgamated rule. (HLA Supp. Br. at 15–28.)  Specifically, HLA relies heavily on the declaration of Dr. Milani Chaloupka to argue that the goals of the proposed consent decree are technically flawed and contrary to the goals and purposes of the ESA and the MSA, (id. at 18–23), and that the proposed consent decree is harmful to and contrary to the public interest (id. at 28–29).  HLA also argues there are alternative, suitable, terms of a consent decree.  (Id. at 31–32.)  Although couched as evidence that the proposed consent decree is not fair, reasonable, or equitable, the Court believes that this is, in fact, an attempt to reach the merits of the underlying dispute.  As the Ninth Circuit has stated "approval of a negotiated agreement is not a decision on the merits and the court should not resolve underlying factual disputes at this stage." Oregon, 913 F.2d at 582.  Instead, although "an intervenor is entitled to present evidence and have its objections heard at the hearings on whether to approve a consent decree, it does not have power to block the decree merely by withholding its consent." Local No. 93, 478 U.S. at 529.  HLA has had

_____

than sufficed.

the opportunity to "air its objections" before the Court, and the Court, in turn, has duly considered them.[16] Accordingly, although HLA has withheld its consent, the Court may still enter the proposed consent decree.

Finally, HLA presents a theory of market transfer effect arguing that the 2004 regulations that "spring into effect" will actually be detrimental to the loggerhead sea turtle population despite lowering the incidental take levels. (Opp'n at 38–40; HLA Supp. Br. at 22–23.) Specifically, HLA contends that lower incidental take levels will inadvertently cause more sea turtle mortalities in foreign fisheries. (See Opp'n at 39.) The Court is not persuaded. As Plaintiffs argued, the possibility that any turtles might be adversely affected by the settlement's approval is speculative at best. (Pls. Reply at 9.) This theory requires not only HLA's members to reach the loggerhead cap before NMFS has completed the new Biological Opinion, but also foreign nations must contemporaneously start

---

[16] At the hearing on this matter, the Court indicated that it was not inclined to have another hearing following the parties' submissions of their supplemental briefs. None of the parties objected to this proposition and none of the supplemental briefs request a further hearing. Because the Court has extensive experience adjudicating lawsuits pertaining to the Fishery, it does not require another hearing to determine whether the proposed consent decree meets the relevant standards. See Oregon, 913 F.2d at 582 ("'The growing rule is that the trial court may limit its proceeding to whatever is necessary to aid it in reaching an informed, just and reasoned decision.'" (quoting Cotton v. Hinton, 559 F.2d 1326, 1331 (5th Cir. 1977))).

fishing more and these foreign fisheries must catch more loggerhead sea turtles than HLA's members would have caught but for the hypothetical closure. This argument is too speculative to be persuasive.

CONCLUSION

The Court has conducted an independent evaluation and a vigorous analysis of the proposed consent decree, and concludes that the proposed consent decree is "fair, reasonable and equitable and does not violate the law or public policy." See Sierra Club, 909 F.2d at 1355. For the reasons stated above, the Court GRANTS Plaintiffs' and Federal Defendants' Joint Motion (Doc. # 102) and APPROVES entry of the proposed consent decree. HLA's Motion for Summary Judgment (Doc. # 86) is DENIED AS MOOT.

IT IS SO ORDERED.

DATED: Honolulu, Hawaii, January 31, 2011.



_____
David Alan Ezra
United States District Judge

Turtle Island Restoration Network, et al. v. U.S. Department of Commerce, et al., CV No. 09-00598 DAE-KSC; ORDER: (1) GRANTING PLAINTIFFS' AND FEDERAL DEFENDANTS' JOINT MOTION TO ENTER STIPULATED INJUNCTION AS AN ORDER OF THE COURT; (2) DENYING AS MOOT HLA'S MOTION FOR SUMMARY JUDGMENT